* * * * * * * * * * *
The Full Commission reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Stephenson and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except for minor modifications. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Stephenson with minor modifications.
 * * * * * * * * * * * *Page 2 
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties in a Pre-Trial Order before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the Commission, and the Commission has jurisdiction of the parties and the subject matter.
2. All parties have been correctly designated, and there is no question as to misjoinder or nonjoinder of parties. The defendant-carrier is a self-insured workers' compensation group fund, licensed by the N.C. Department of Insurance.
3. The parties are both subject to the Workers' Compensation Act.
4. On March 19, 2001, the plaintiff was the employee of defendant-employer Rutherford Management Corporation d/b/a McDonald's Restaurant.
5. The plaintiff sustained a compensable injury by accident on or about March 19, 2001, while working for the defendant-employer, when she was assaulted and battered during the course of a robbery.
6. The defendants accepted this claim on a Form 60 dated April 11, 2001, and the defendants have paid temporary total disability benefits at the rate of $141.67 per week from March 26, 2001, to the present.
7. As to the plaintiff's average weekly wage, the parties' stipulate that:
 a. If the period of March 19, 2000 to March 19, 2001, is used to calculate average weekly wage, the average weekly wage is $249.68 (defendant's position); *Page 3 
 b. If the period of May 17, 1999 through May 14, 2000, is used to calculate average weekly wage, the average weekly wage is $311.33 (plaintiff's position).
8. The parties also stipulated to various medical records, which were made a part of the record as Exhibit A.
 * * * * * * * * * * *
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. The plaintiff was sixty-two years old at the time of hearing before the Deputy Commissioner. She completed the eighth grade and earned a G.E.D. The plaintiff worked for McDonald's, the defendant-employer, since 1995 when she was hired as breakfast manager. The plaintiff's shift began daily at 5:00 am, and she worked until 1:00 pm.
2. In early 2000, the plaintiff's husband was diagnosed with terminal cancer. By mid-May of 2000, her husband required twenty-four hour care. On or about May 15, 2000, the plaintiff modified her work hours to a reduced schedule of 5:00 am to 11:00 am, so that she could better care for her husband. The plaintiff's husband died on January 8, 2001. The plaintiff continued with her modified schedule through her bereavement, and made plans to resume her full-time schedule on Monday, March 19, 2001.
3. On March 19, 2001, the plaintiff reported to work at 5:00 am. As she entered the restaurant, she was tackled from behind by an intruder and thrown to the ground. The fall broke the plaintiff's hip. The assailant took money from the plaintiff's purse and then told her that he would kill her if she did not get up to open the safe. The plaintiff was unable to get up because *Page 4 
of the severe pain caused by her broken hip, so the assailant kicked her and pistol-whipped her. The assailant told the plaintiff that he would shoot her co-worker if she did not open the safe. The plaintiff dragged herself to the safe and opened it. Upon emptying the safe, the assailant dragged the plaintiff to the cooler and locked her inside. The entire ordeal lasted from thirty to forty-five minutes. The plaintiff has remained out of work and disabled since this incident.
4. As a result of the accident, the plaintiff experienced a femoral neck fracture of her left hip, and she was hospitalized for approximately five days while she received an emergency pinning and reduction of the left hip on the day of the attack by Dr. Rhett Rudolph, an orthopedic surgeon. Dr. Rudolph testified at deposition that during the emergency surgery he identified a "Garden 4" 100 percent displaced fracture, broken in a "Powell 3" downward facing pattern, which is the pattern most likely to eventually cause avascular necrosis. The surgical procedure was successful in reducing the fracture; however, beginning with her post-surgical hospitalization, the plaintiff suffered psychological complications from the attack. Dr. Rudolph testified at deposition that:
 Hospitilization-wise, she did very well. I think her biggest problem, along with her hip, is that because of the trauma that she sustained, a hip fracture in the robbery, she had a lot of emotional post traumatic-type problems. She couldn't sleep. She really didn't get around very well. She couldn't stay by herself. All of those kinds of things contributed, I think, to how well she got — how well she did not get better.
5. The plaintiff followed up with Dr. Rudolph on March 29, 2001. Dr. Rudolph noted that: "[S]he had a lot of nightmares, a great deal of difficulty sleeping. She kept feeling like somebody was outside of her room. She was very distressed."
6. During a visit to Dr. Rudolph on April 6, 2001, the plaintiff reported sacroiliac joint pain radiating out in the buttock, a result of gait dysfunction. By April 20, 2001, the *Page 5 
plaintiff continued to have pain from the hip, which remained a concern for Dr. Rudolph; however, Dr. Rudolph testified that: "I really felt like her biggest problem and her most possessive problem, at that point in time, was her post-traumatic stress."
7. On May 18, 2001, the plaintiff began psychological treatment with Thomas M. LaBreche, Ph.D., a psychologist who specializes in the treatment of depression and anxiety disorders, including post-traumatic stress disorder (PTSD). Dr. LaBreche ultimately diagnosed the plaintiff with anxiety and PTSD, finding that the history given by the plaintiff matched the prescriptive criteria for PTSD as detailed in the DSM-IV-TR, the diagnostic standard for all psychologists and psychiatrists. Dr. LaBreche noted the traumatic events experienced by the plaintiff on March 19, 2001, and the plaintiff's resulting fear and helplessness. He also noted that plaintiff experienced intrusive thoughts, recurrent nightmares, and reliving features of the experience, which are all characteristic of PTSD. Dr. LaBreche further noted that the plaintiff's PTSD had caused her to become less responsive and avoidant of stimuli associated with the trauma. Dr. LaBreche testified that the symptoms of PTSD can be long lasting and can even last an entire lifetime.
8. In November 2001, the plaintiff continued to experience pain in her hip. She underwent an additional procedure to remove two of the screws in her hip.
9. The plaintiff continued to seek psychological treatment for her work-related anxiety and PTSD with Dr. LaBreche through late 2001, when the carrier refused to authorize further psychological treatment. In a letter dated January 7, 2002, from Dr. LaBreche to the plaintiff's nurse case manager, Dr. LaBreche documented the plaintiff's need for continuing mental treatment. The carrier authorized four more visits with Dr. LaBreche, then no more. *Page 6 
10. The plaintiff continued to have hip pain through April 2002. Although Dr. Rudolph was not of the opinion that further surgery, including a possible hip replacement, was necessary at that juncture, he noted on April 11, 2002: "At this time, I think we should stop trying to get [the plaintiff] back to work in any capacity. I don't think we can get it to happen any time soon." At deposition, Dr. Rudolph added that the plaintiff, "was just not recovering well at all."
11. On August 4, 2002, Dr. LaBreche wrote a termination summary at the request of the carrier, detailing the plaintiff's ongoing need for psychological treatment for her PTSD, depression, and anxiety problems.
12. On March 3, 2004, the plaintiff returned to Dr. LaBreche for a single visit that she paid out of pocket. Dr. LaBreche noted a heightened level of anxiety, which was more generalized; intermittent panic attacks; and compulsive behaviors that were characteristic of PTSD, such as checking on doors because she was fearful someone would attack her. The plaintiff also exhibited more physical problems, including incontinence, chronic headaches, and back pain secondary to changes in her gait. Dr. LaBreche's overall assessment was that the plaintiff was going "downhill."
13. Dr. LaBreche evaluated the plaintiff two times in early 2006 for purposes of this action, at which time he found that the plaintiff's depression had become much more pronounced as compared to his initial contacts. He again noted generalized anxiety features, intermittent panic attacks, and compulsive behaviors attributable to PTSD.
14. Dr. LaBreche testified at deposition to a reasonable degree of psychological probability, and the Full Commission finds as fact, that the plaintiff's psychological problems, including depression, anxiety, and PTSD, are a result of the assault at work on March 19, 2001. *Page 7 
Dr. LaBreche further testified, and the Full Commission finds as fact, that the plaintiff is incapable of obtaining and maintaining competitive employment. He further elaborated that the plaintiff's psychological condition would make it difficult for her to function under pressure, impair her ability to follow directions, undermine her ability to concentrate, impair her ability to perform activities within a schedule, disrupt her ability to work in proximity with others, and impair her ability to work a normal workday and workweek.
15. The plaintiff was seen by psychologist Verne Schmickley, Ph.D., for a one-time psychological evaluation for purposes of this claim. Dr. Schmickley concurred that the plaintiff's problems were consistent with the diagnosis of PTSD, but was of the opinion at deposition that the plaintiff no longer suffers from the condition because "PTSD is no longer seen necessarily as a permanent or disabling condition." The Full Commission finds that Dr. Schmickley's assessment of the plaintiff was largely based upon his review of research, as opposed to his evaluation of the plaintiff or her medical records. Dr. LaBreche, the plaintiff's treating psychologist, did not agree with Dr. Schmickley's interpretation of research regarding PTSD, and did not agree with Dr. Schmickley's assessment of the plaintiff. The Full Commission, in its discretion, gives greater weight to the testimony of Dr. LaBreche over Dr. Schmickley because Dr. LaBreche was the plaintiff's treating psychologist and is, thus, in a better position to render an opinion regarding the causation of the plaintiff's psychological problems and the plaintiff's employment capacity.
16. The plaintiff continued to treat with Dr. Rudolph regarding her ongoing hip pain. On September 8, 2002, Dr. Rudolph assigned a permanent partial rating of thirty percent (30%) to the left leg, pending a total hip replacement. *Page 8 
17. On September 30, 2003, the plaintiff treated with Dr. Rudolph and reported radicular pain down both legs, worse than the previous pain that extended down the left leg. Dr. Rudolph was of the opinion that the bilateral pain was a result of the foraminal stenosis, and was exacerbated by the limp that she sustained as a result of her hip fracture. The plaintiff continued to treat with Dr. Rudolph through the date of his deposition in this matter. At that time, Dr. Rudolph continued to be of the opinion that the plaintiff would be in need of a hip replacement in the future.
18. At the time of Dr. LaBreche's deposition in this matter, the carrier had not provided continuing psychological treatment for the plaintiff's depression, anxiety, and PTSD, which the Commission finds to be causally related to the work-related incident on March 19, 2001. Dr. LaBreche testified that the plaintiff was in need of individual psychotherapy, and psychiatric follow-up on her medications. He stated that if the plaintiff is not treated, "her condition could in fact deteriorate to the point where she absolutely might need an in-patient level of care."
19. The evidence of record shows that the plaintiff worked reduced hours during the fifty-two weeks preceding her injury because she was caring for her husband during his terminal struggle with cancer. On or about May 15, 2000, the plaintiff began this reduced schedule that continued through her husband's death on January 8, 2001, and through a brief period of bereavement. The plaintiff was to resume her normal, full-time schedule on March 19, 2001, the same morning she was attacked at work. Given these facts, the Full Commission finds that a "fifth-method" calculation of the plaintiff's average weekly wage based upon the income she was making during the fifty-two weeks prior to May 15, 2000 (when she began a reduced schedule to care for her terminally ill husband) provides a result that is fair and just to both *Page 9 
parties. Conversely, it would be unjust to calculate the plaintiff's average weekly wage based upon the standard fifty-two weeks prior to the injury because this period does not reflect the full-time wages to which the plaintiff had returned on the date of injury. Therefore, the plaintiff's average weekly wage is calculated to be $311.33, as this is the amount she would be earning but for the injury. An average weekly wage of $311.33 yields a weekly compensation rate of $207.55.
20. Based upon the competent evidence of record, the Full Commission finds that the plaintiff continues to be temporarily totally disabled as a consequence of the work-related incident occurring on March 19, 2001. Further, the Full Commission finds that the plaintiff is in need of continuing medical treatment for her hip condition and psychological conditions (including depression, anxiety, and PTSD), which are causally related to the work-related incident occurring on March 19, 2001.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. The plaintiff sustained an injury by accident occurring within the course and scope of her employment on March 19, 2001. N.C. Gen. Stat. § 97-2(6).
2. The Full Commission concludes that a "fifth-method" calculation of the plaintiff's average weekly wage based upon the income she was making during the fifty-two weeks prior to May 15, 2000 (when she began a reduced schedule to care for her terminally ill husband) provides a result that is fair and just to both parties. N.C. Gen. Stat. § 97-2(5); and Hendricks v. Hill Realty Group, Inc., 131 N.C. App. 859,509 S.E.2d 801 (1998). Conversely, it would be *Page 10 
unjust to calculate the plaintiff's average weekly wage based upon the standard fifty-two weeks prior to the injury because this period does not reflect the full-time wages to which the plaintiff had returned on the date of injury. Id. Therefore, the plaintiff's average weekly wage is calculated to be $311.33, as this is the amount she would be earning but for the injury. Id. An average weekly wage of $311.33 yields a weekly compensation rate of $207.55.
3. The plaintiff is entitled to temporary total disability compensation at the weekly rate of $207.55 from March 19, 2001, and continuing until further order of the Commission. N.C. Gen. Stat. §97-29; Russell v. Lowes Product Distribution, 108 N.C. App. 762,425 S.E.2d 454 (1993).
4. The plaintiff is entitled to receive medical treatment for her hip condition (including a hip replacement, when needed) and psychological conditions (including depression, anxiety, and PTSD), which is reasonably necessary to give relief, effect a cure, or lessen the period of the plaintiff's disability. N.C. Gen. Stat. §§ 97-2(19) and 97-25.
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. The defendants shall pay to the plaintiff temporary total disability compensation at the weekly rate of $207.55 from March 19, 2001, and continuing until further order of the Commission, subject to the attorney's fee provided herein. Any compensation that has accrued shall be paid to the plaintiff in a lump sum.
2. The defendants shall provide to the plaintiff medical treatment for her hip condition (including a hip replacement, when needed) and psychological conditions (including *Page 11 
depression, anxiety, and PTSD), which is reasonably necessary to give relief, effect a cure, or lessen the period of the plaintiff's disability.
3. The defendants shall pay directly to the plaintiff's counsel a reasonable attorney's fee in the amount of twenty-five percent (25%) of the compensation awarded to the plaintiff herein. Fees that have accrued shall be paid directly to the plaintiff's counsel in a lump sum; thereafter, the defendants shall pay directly to the plaintiff's counsel every fourth check of compensation due the plaintiff.
4. The defendants shall pay the costs of this action.
This 16th day of July 2007.
 S/______________________
 CHRISTOPHER SCOTT
 COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/______________________ PAMELA T. YOUNG COMMISSIONER. *Page 1